TACHA, Circuit Judge,
dissenting.
I dissent from parts II and III of the majority opinion.
I. Permitted Use Rulé
With respect to the new permitted use rule, I fundamentally disagree with the majority on the meaning and importance of the statutory command that “[s]o far as consistent with the purposes and provisions of [the Taylor Grazing Act], grazing privileges recognized and acknowledged shall be adequately safeguarded_” 43 U.S.C. § 315b (emphasis added). In my judgment, this statutory command requires the Secretary to continue to recognize permittees’ adjudicated grazing levels, called the “grazing preference” in the pre-1995 regulations. The majority does not accord the statutory language much, if any, importance, and finds it to be ambiguous at best, meaningless at worst. The majority also concludes, I think erroneously, that adjudicated grazing levels have not been “ ‘recognized’ under any regulations promulgated since the enactment of FLPMA” in 1977. Maj. op. at 1171.
This issue is a highly complicated issue to review because it is virtually impossible to adequately understand the mechanics of grazing on the public range and how it is administered from a reading of the relevant regulations. Even upon reading the briefs, cited authorities, BLM decisions, and scholarly commentaries on the public lands, one is left with a rather incomplete comprehension of the system. Nevertheless, as thorough an understanding as possible of how the grazing preference system has worked since its inception in 1934 is essential for our proper review.
A. Historical Role of the Grazing Preference
At the time the TGA was passed in 1934, there were many more applicants for grazing privileges than could be accommodated, a fact .that Congress knew. See H.R. Rep. No. 73-903, at 1 (1934) -(stating that the public lands “are now being used without supervision or regulation, and there is constant competition among the various users who desire to obtain exclusive benefit of the forage *1183 growth.”)- Congress charged the Secretary with fairly and orderly allocating grazing privileges on the public lands. It was clear that whatever system the Secretary installed would result in recognizing privileges for certain applicants to graze on the public lands while denying privileges to other applicants. To guide the Secretary in this process, Congress articulated which groups were to receive first priority in the distribution of permits. See 43 U.S.C. § 315b (“Preference shall be given in the issuánce of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights_”). The Secretary must engage in that process even today when new lands become open for grazing. See, e.g., Webster v. BLM, 97 I.B.L.A. 1 (1987) (reviewing grazing application regarding lands that came under BLM control in 1984).
Following the TGA’s passage in 1934, the Secretary began the lengthy adjudicatory process of allocating grazing privileges. That process took many years to complete. When the Secretary made a favorable decision on a grazing application, he (1) issued a permit to the applicant, (2) identified the property owned by the permittee that was to serve as the base for the livestock operation and to which the grazing privileges attached, and (3) identified the maximum amount of forage, expressed in AUMs, that the permit-tee could graze on the public lands. Cf Federal Range Code, § 6(b) (1938) (describing priority of issuance of grazing permits to qualified applicants). That maximum amount of forage eventually became known as the grazing preference, although that term was not added to the grazing regulations until 1978. See 43 C.F.R. § 4100.0-5(o) (1978).
The grazing preference, or the historically adjudicated grazing level, was distinct from the permit to graze. The permit was the ten-year license granted to the applicant, giving him the right to graze livestock on the public range up to the amount of forage allocated by the Secretary. The grazing preference was the Secretary’s maximum allocation of forage to the individual permittee and was in most eases, if established prior to 1978 (as most preferences were), based on either the permittee’s historical use of public range or the historically available forage on the permittee’s private lands, whichever was lower. See McLean v. BLM, 133 IBLA 225, 231-32 & nn. 9-10 (1995). There is no question that FLPMA and the 1978 regulations altered the criteria for awarding new preferences and increasing already-existing preferences, see id. at 235, but there is also no question, contrary to the majority’s assertion, that the 1978 regulations continued to recognize already-existing grazing preferences, see 43 Fed.Reg. 29,058 (July 5, 1978) (stating that permittees’ “adjudicated grazing use, their base properties, and their areas of use (allotments) will be recognized under these grazing regulations.”).
The grazing preference never guaranteed a permittee the right to graze that amount of forage every year. Rather, the grazing preference represented the upper limit of forage that the permittee could graze if enough forage were available. Under the 1978 regulations, a permittee’s grazing preference included both “active use” and “suspended use.” 43 C.F.R. § 4110.2-2(a) (1994). A permittee’s active use could fluctuate over time based on available forage and the carrying capacity of the land. Active use could be reduced if grazing was causing an “unacceptable level or pattern of utilization or ex-eeed[ed] the livestock carrying capacity,” id. § 4110.3-2(b), and could be suspended in whole or in part on a temporary basis due to drought, fire, or other natural causes, or to facilitate range improvements, see id. § 4110.3-2(a). Similarly, should additional forage beeome available, a permittee’s active use could increase up to the amount of the grazing preference. Id. § 4110.3-1(a),(b). In short, the grazing preference represented the upper limit that a permittee could graze if optimal conditions prevailed, all relevant land could be placed in active use, and the Secretary allowed him or her to graze up to that upper limit.
Under the 1978 regulations, the Secretary could change the maximum amount of forage represented by the grazing preference on a case-by-case basis. See 43 C.F.R. § 4110.3 (1994); Gordon v. BLM, 140 IBLA 112 (1997) (addressing BLM’s' 1992 decision to *1184 reduce grazing preference of permittee who, according to BLM, had lost control of his base property). A decision by the authorized officer to change a permittee’s grazing preference had to be supported by rangeland studies conducted over time, unless the change was “either specified in an applicable land use plan or necessary to manage, maintain or improve rangeland productivity.” 43 C.F.R. § 4110.3 (1994); see also id. § 4110.4-2 (providing for cancellation or suspension of grazing preference upon decrease in public land acreage available for grazing). Thus, under the prior regulations, changes in a grazing preference were based either on the individual circumstances of a particular per-mittee — e.g., in response to a change in the permittee’s control over the base property— or on the condition of particular grazing allotments — e.g., if a reduction in grazing was necessary to improve rangeland productivity.
The grazing preference served as a stabilizing force for the livestock industry and promoted orderly use of the range by guaranteeing permittees the right to graze a-predictable number of stock on the public lands and by allowing them to gauge how large or small their livestock operations could be. Stabilization of the livestock industry and promoting orderly use of the range were two of the primary purposes of the TGA. See TGA preamble, 48 Stat. 1269 (uncodified). Possession of a grazing preference attached to qualified base property guaranteed a rancher in possession of a permit the right to graze forage up to the amount specified by the preference so long as forage was available. The fact that a permittee’s authorized active use might differ from the total forage in the grazing preference did not remove the certainty that accompanied the preference. Permittees knew and understood that there would be year-to-year fluctuations in available forage and changes in the overall conditions of the range, and the Secretary had full authority under the TGA to make individual adjustments in active use. See 43 U.S.C. § 315b (providing that the Secretary “shall specify from time to time numbers of stock and seasons of use.”). Nonetheless, the grazing preference guaranteed permittees a right to graze from year to year those amounts of forage that the Secretary actually authorized and provided them with the certainty that if forage were abundant, grazing up to their preference limit would be authorized.
Despite annual fluctuations in active use, the preference level generally remained the same from year-to-year, through transfers of the base property, and from permit-to-permit, though there is no question that the Secretary could also effect changes in preference levels as described above. Such authority to change preference levels was in accord with section three of the TGA, which gives the Secretary the authority to “specify from time to time numbers of stock and seasons of use.” 43 U.S.C. § 315b. At the end of the permit’s term, if the Secretary renewed the permit, the permittee again had the right to graze on the public lands in accordance with the grazing preference. • Thus, the grazing preference remained in place not just from year-to-year within the ten-year term of the permit, but also from permit-to-permit. Grazing preferences could be transferred from one qualified permittee to another qualified permittee, and they were often pledged as security for loans taken out by permittees.
Based on my historical understanding of grazing preferences and the importance that they assumed in the operation of permittees’ livestock businesses, I can only conclude that these adjudicated grazing levels, whether referred to by the label “grazing preference” or by any other name, were an essential part of the permittees’ grazing privileges. Section three of the TGA gives permittees a preferential right of renewal of their permits; in my judgment, the adjudicated grazing levels are part and parcel of that preferential renewal right. In making the grazing decisions, the Secretary determined that certain permittees were entitled to priority in the issuance of permits and that, based on their historic use of the range, they were entitled to graze up to a quantifiable level of forage. When the Secretary reviewed grazing permits for renewal, he was guided by the original adjudications in which he had determined that the permittee was a preferred applicant and in which he identified the maximum forage level that the permittee was entitled to graze.
*1185 The Secretary issued those individualized adjudications after engaging in a long process of collecting data, reviewing applications, accepting the recommendations of local grazing advisory boards, and determining whether the applicant was entitled to priority in the issuance of a permit. In issuing grazing decisions, the specific allocation of forage was recorded in the Secretary’s logs. The Secretary undertook that process to satisfy its statutory obligation to issue grazing permits according to the priorities articulated by Congress in section three of the statute. The Secretary particularized each grazing decision to the individual permittee. Since the issuance of those original grazing decisions, changes to the grazing preferences have occurred on a case-by-ease basis, subject to the Secretary’s detailed regulatory requirements. See 43 C.F.R. § 4110.3 (1994) (describing process for making changes in grazing preference status); Miller v. BLM, 118 IBLA 354 (affirming Secretary’s denial of increases in permittees’ grazing preferences). I conclude that those grazing adjudications are an integral part of permittees’ grazing privileges.
B. Grazing Adjudications Continued in 1978 Regulations
At least two statements from the majority’s opinion demonstrate that we clearly do not share the same understanding of the issue before us today, particularly regarding the nature and role of the grazing adjudications. In discussing FLPMA and the 1978 regulations promulgated thereafter, the majority states that “[wjhile the previously adjudicated grazing uses were to be recognized for the length of existing permits, ‘future adjudications of grazing use would be based on criteria vastly different than those provided in the Federal Range Code.’ ” Maj. Op. at 1169 (quoting Interior Board of Land Appeals decision, McLean v. BLM, 133 IBLA 225 (1995)). The majority also states that “[njowhere in the 1978 regulations was there any requirement, or even the suggestion, that the authorizing officer must recognize or refer to the original grazing adjudications, or even the most recent adjudications, in issuing new permits.” Maj. Op. at 1169 (emphasis added). The italicized portions, in particular, demonstrate that the majority thinks that under the new regulations, each time a ten-year permit is renewed, the Secretary somehow engages, in a new “adjudication.”
As I understand it, this has never been the case, as the discussion above indicates. Rather, a grazing adjudication was a onetime decision of the Secretary, made when he first allocated grazing privileges on a particular allotment of the public range. Historically, there were many more applicants for use of the range than could be accommodated, so the Secretary had to grant grazing privileges to some and deny privileges to others. The adjudicatory process of allocating those privileges took nearly two decades. Thereafter, the Secretary engaged in that same type of adjudicatory process only when new public lands became available for grazing. In determining which applicants were to receive grazing privileges, the Secretary determined whether the applicant was a member of a preferred group listed in section three of the TGA, and evaluated the amount of forage on the public lands the applicant had typically used. Then, the Secretary issued a decision, issuing a grazing permit and also declaring the maximum level of forage the permittee could graze (i.e., the grazing preference). When a permit came up for renewal, the Secretary either renewed the permit in accordance with the grazing preference, or he denied the permit. Based on my understanding of this system, I can only conclude that the historically adjudicated grazing preference is an integral aspect of a permittee’s grazing privileges, and in particular the “preference right of the permittees to renewal” of their permits, referred to in section three of the TGA.
I agree with the majority that passage of FLPMA and the 1978 regulations drastically changed the criteria that were to guide the Secretary in future adjudications. Indeed, the majority cites an Interior Board of Land Appeals decision that makes that point convincingly. See Maj. Op, at 1169 (quoting McLean,133 IBLA at 233). The majority, however, simply does not understand what that means. A “future adjudication,” as that phrase was used in the McLean decision, does not refer to the renewal of a grazing permit, as the majority asserts, nor to future *1186 decisions by the Secretary respecting allotments on public lands already under BLM control and with respect to which an adjudication has already occurred. Rather, a “future adjudication” is a post-1978 decision made by the Secretary to allocate permanent grazing privileges to various applicants when new lands come under BLM control and become available for grazing. McLean v. BLM illustrates well my point. There, the appellants had applied for a substantial increase in their active use in an allotment in which additional forage had become available for grazing. See McLean, 133 IBLA at 226. That allotment was under BLM control and was already open to grazing. Thus, the Secretary had already allocated grazing privileges on that land and adjudicated maximum grazing levels. Because the appellants were already making full usé of their grazing preference in the allotment, their request was denied. In accordance with the 1978 regulations, the BLM Area Manager then allocated the newly available forage in the allotment to other permittees who were not making full use of their grazing preferences. The Area Manager’s decision to increase those permit-tees’ active use was not an “adjudication.” Rather, the Area Manager increased the other permittees’ active use up to their fully authorized and previously adjudicated grazing levels (i.e., their grazing preferences). Those grazing preferences had been determined in a prior grazing adjudication. Indeed, the McLean case makes clear that the appellants’ grazing preference dated from an adjudication that occurred at least no later than 1970, and more likely well before that. See id. at 227. The McLean case also makes clear that a “future adjudication” (i.e., a post-978 adjudication) only occurs when completely new land comes within BLM control, and numerous applicants vie for the right to graze that land. In McLean, new land had not become available; rather, land already under BLM control and open to grazing saw increased levels of forage. The Secretary did not engage in a new adjudication to allocate that forage, but instead increased the active use of those permittees already with grazing privileges in that allotment in proportion to the preference levels previously adjudicated.
The McLean decision makes clear that most permittees’ grazing preferences arose in pre-1978 grazing adjudications since most BLM land was opened to grazing immediately following the TGA’s passage in 1934. Some grazing preferences derived from post-1978 adjudications, when new land became available for grazing. In either case, however, the only difference is the criteria that guided the Secretary in allocating the grazing privileges. Both sets of grazing preferences derived from grazing adjudications and were individualized to particular permittees. An original grazing decision awarded forage use according to a particular permittee’s application. for a grazing permit. If a permit-tee’s grazing permit were renewed at the end of the life of the permit, the adjudicated grazing preference generally continued unchanged in that new permit. In most cases, recognition of the results of the original grazing decisions continued up to the 1995 revisions. See, e.g., Ortiz v. BLM, 126 I.B.L.A. 8, 9 (1993) (discussing permittee’s grazing preference which, despite numerous transfers, “dates from the early 1930s,” when it was issued to the original applicant). In the time since BLM issued an original grazing decision, changes in grazing preferences have been individualized, based on the circumstances of particular permittees and the condition of particular grazing allotments. Thus, until the 1995 regulations, the Secretary had safeguarded the results of the original grazing adjudications through continued recognition of the original grazing preference.
C. Effect of the Secretary’s New “Permitted Use” Regulation
The Secretary’s new permitted use rule ends the long-standing DOI recognition of the adjudicated levels of grazing known as the grazing preference. The Secretary argues that “AUMs are protected and not eliminated under the new rules, and the language in the new term ‘permitted use’ ... does not effect a substantive change from the previous regulation.” Appellant’s Br. at 20 (emphasis in original). The Secretary does not acknowledge that the new regulations end recognition of the adjudicated grazing preference. Rather, the Secretary asserts that the *1187 new permitted use “encompasses all of the essential elements of the prior term [i.e., grazing preference].” Id.
The pre-1995 “grazing preference” was defined as the “total number of [AUMs] of livestock grazing on public lands apportioned and attached to base property owned or controlled by a permittee or lessee.” 43 C.F.R. § 4100.0-5 (1994). Under this regulation, the number of AUMs “apportioned and attached” to the permittee’s base property was the number of AUMs allocated to the permit-tee (or her predecessor) by an individual grazing adjudication. See McLean v. BLM, 133 I.B.L.A. 225, 232-33 & n. 12 (1995) (noting that while 1978 regulations drastically changed grazing preference system, new system continued to recognize individual adjudications made prior to 1978); see also 43 Fed.Reg. 29,058 (July 5, 1978) (addressing permittees’ concerns about post-1978 regulatory scheme and stating that permittees’ “adjudicated grazing use ... will be recognized under these grazing regulations”) (quoted in McLean, 133 I.B.L.A. at 233).
The “permitted use” introduced in the 1995 regulations is defined as “the forage allocated by, or under the guidance of, an applicable land use plan for livestock grazing in an allotment under a permit or lease and ... expressed in AUMs.” 43 C.F.R. § 4100.0-5 (1995). Unlike the old “grazing preference,” the “permitted use” no longer refers to the number of AUMs determined by individual grazing adjudications. The Secretary’s own interpretation of the permitted use rule makes this clear.
Grazing preference is redefined to mean the priority to have a Federal permit or lease for a public land grazing allotment that is attached to base property owned or controlled by a permittee_ The definition omits reference to a specified quantity of forage, a practice that was adopted ... during the adjudication of grazing privileges .... BLM will identify the amount of grazing use (AUMs), consistent with land use plans, in grazing use authorizations to be issued under a ... permit.
A definition of Permitted use is added to define the amount of forage in an allotment that is allocated for livestock grazing and authorized for use ... under a grazing permit.... The term replaces the AUMs of forage use previously associated with grazing preference.
60 Fed.Reg. at 9921 (emphasis added); see also id. at 9922-23. (“The objectives set in the [land use] plan are refined in the permit ..., and permitted use is then expressed in AUMs of active use ..., as well as suspended use and temporary nonuse during a particular time period.”). The majority never squarely addresses whether the new regulations end recognition of the original adjudications because it concludes that the adjudications have not been recognized under any regulations since the enactment of FLPMA in 1977. See Maj. Op. at 1171. I refer to my above discussion in section I.B of this dissent to make the point that the adjudications were indeed recognized until the 1995 regulations.
Under the permitted use rule, the maximum amount of forage that a permittee can graze is established solely by a land use plan adopted by the BLM, with no reference to the results of the grazing adjudications. By contrast with the old system, the new permitted use approach ends recognition of the grazing preference across the board, for all permittees, without reference either to their individual circumstances or to the condition of the land covered by their permits. Under the new regulations, a permittee’s grazing privileges consist of the right to use the AUMs specified in the grazing permit for a ten-year term and a bald right to preference at renewal time. Gone is recognition of the underlying adjudication in which the Secretary made a determination that, vis-a-vis other applicants, the permittee was a member of a priority group entitled to graze up to a maximum amount of forage on a particular allotment, and to which the Secretary previously always referred in renewing grazing permits.
There is no guarantee that the permittee will be allowed to graze predictable amounts of forage upon renewal, nor that the permit-tee’s priority position is secure. I think this difference is significant, for it erases the certainty and predictability that existed under the pre-1995 regulatory scheme and that I am certain was required by Congress under the TGA. The result is that the agency *1188 has nearly unfettered discretion to collectively increase or decrease permittees’ maximum allowed forage use without reference to the individual grazing decisions laboriously adjudicated by the Secretary following passage of the TGA.
D. Statutory Mandate
The dispositive question at issue regarding the new permitted use rule is whether the Secretary’s elimination of adjudicated grazing preferences conflicts with Congress’s mandate that “grazing privileges recognized and acknowledged shall be adequately safeguarded.” To answer this question, Chevron requires us to ask whether that mandate is an unambiguous expression of Congressional policy, for if it is, the courts, “as well as the agency, must give effect to the unambiguously expressed intent of Congress.” Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
In examining this language, we assume that the words chosen by Congress are employed in their ordinary sense and accurately express Congress’s legislative purpose. See FMC Corp. v. Holliday, 498 U.S. 52, 57, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). The words “grazing privileges” are straightforward. In the context of the TGA, a grazing-privilege is the legislatively authorized right to use an allotment of the public lands for grazing livestock under terms set by the Secretary. See 43 U.S.C. § 315b. What then, is a “recognized and acknowledged” grazing privilege? In the context of the TGA, it seems to me, the answer to that question is-also straightforward. With its delineations of groups that are to receive first priority in the distribution of permits, section three of the TGA envisions the Secretary’s undertaking an adjudicatory process in order to fairly and orderly allocate grazing privileges on the public lands. See 43 U.S.C. § 315b (“Preference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights_”).
I would hold that the phrase “grazing privileges recognized and acknowledged” unambiguously refers to the grazing privileges that Congress charged the Secretary with allocating in section three of the TGA, including the adjudicated grazing levels. The Secretary allocated these privileges to qualified applicants through a detailed adjudication process that took many years to complete. Although Congress did not specify the exact system to be used beyond the initial preferences set forth in section three of the Act, it knew that such an adjudicatory process was necessary in order to identify those livestock operators who should be able to use the public range for grazing.
Similarly, I would conclude that use of the term “adequately safeguarded” is an unambiguous expression of Congress’s intent that the Secretary protect the grazing privileges that are recognized and acknowledged by the adjudication process undertaken following passage of the TGA. To safeguard means to protect or defend. See Webster’s Third New International Dictionary (1981). Even though the modifier “adequately” is necessarily ambiguous, and what constitutes an adequate safeguard rests with the discretion of Secretary, the Secretary cannot altogether abandon his obligation to safeguard recognized grazing privileges. I do not question the authority of the Secretary to revoke a grazing permit because of a permittee’s failure to comply with the terms and conditions of the permit or the grazing regulations. See 43 U.S.C. § 1752(a). So long as grazing privileges are unrevoked, however, the Secretary may not interfere with their exercise. See, e.g., Oman, 179 F.2d at 742 (noting that Secretary has “affirmative obligation” to safeguard grazing privileges).
There are at least two well-settled aspects to the Secretary’s obligation to safeguard grazing privileges. First, the Secretary “must observe statutory preferences and priorities in granting and renewing permits.” George C. Coggins & Robert L. Glicksman, Public Natural Resources Law § 19.02[l][c] (1997). Second, the Secretary must protect a permittee’s allotment from trespasses by competing livestock operators. See id.; Oman v. United States, 179 F.2d 738, 739-742 (10th Cir.1949) (allowing per-mittee with exclusive grazing privileges to bring Federal Tort Claims Act against gov- *1189 eminent for failing to prevent other livestock operators from using land covered by permit and noting that Secretary had duty, under TGA, to safeguard plaintiffs grazing privileges against such trespass). The question before this Court today is whether the Secretary’s duty to safeguard also includes an obligation to continue to recognize the adjudicated grazing levels, embodied in the pre-1995 regulations in the term “grazing preference.” The majority does not answer this question because it concludes that even under the prior regulations, the historical grazing adjudications were not recognized. The majority is mistaken on this latter point, however. In failing to even address this question, the majority reveals a lack of understanding of the preference system that had been in place since 1934 and the regulatory scheme that implemented that system.
Congress requires the Secretary to safeguard. permittees’ recognized and acknowledged grazing privileges. In the permitted use rule, the Secretary has failed to safeguard the results of the grazing adjudications in which permittees’ privileges were first recognized and acknowledged. The new permitted use rule, in effect, wipes the slate clean. That permittees will not immediately lose their right to graze on the public lands seems, to me, irrelevant. When the Secretary undertook to allocate privileges to various applicants to graze a particular allotment on of the public range, he made a series of determinations. He determined that the applicant either was or was not a member of a priority group. He determined whether the applicant had made historic use of the range. He determined what level of forage the applicant had used and whether, vis-a-vis all other applicants, that applicant should be entitled to continue that level of use. Then, he awarded a successful applicant a grazing-preference to graze up to a certain amount of forage, not just for the life of the permit, but for as long as the Secretary allowed the permittee to graze on the public lands. The majority’s decision upholding the permitted use rule, in my judgment, reads out the central statutory mandate of section three of the Taylor Grazing Act.
I do not deny that the Secretary has full authority to control permittees’ use of the range. See 43 U.S.C. § 315b (“[The Secretary] shall specify from time to time numbers of stock and seasons of use.”). The Secretary, however, lacks the authority to eliminate recognition of the underlying adjudications upon which permittees’ grazing privileges are based and upon which they rely in running their livestock operations. Because the Secretary exceeded his statutory authority under the Taylor Grazing Act by promulgating the new permitted use regulations, I would set 'aside the regulations that define permitted use without reference to the original grazing adjudications.
II Title to Range Improvements
I also disagree with the majority’s conclusion that section four of the TGA is ambiguous with respect to ownership of rangeland improvements constructed by a permittee on the public lands. The majority concludes that the TGA is ambiguous as to whether permittees who construct improvements should hold title to those improvements, and therefore the Secretary was within his authority promulgating new 43 C.F.R. § 4120.3-2(b) (1995). That new regulation states that title to all permanent range improvements authorized under cooperative agreements after August 21, 1995 shall be in the United States. A cooperative agreement is an agreement between a permittee and the Secretary whereby both parties jointly pay for the construction of a rangeland improvement.
I agree with the PLC that the TGA grants permittees ownership rights in improvements constructed either in whole or in part by the permittee. The following language from section four of the TGA is relevant:
Fences, wells, reservoirs, and other improvements; construction; permits; partition fences.
Fences, wells, reservoirs, and other improvements necessary to the care and management of the permitted livestock may be constructed on the public lands within such grazing districts under permit issued by the Secretary or under such cooperative arrangement as the Secretary may approve. No permit shall be issued which shall entitle the permittee to the use of such improvements constructed and owned by a prior occupant until the *1190 applicant has paid to such prior occupant the reasonable value of such improvements to be determined under rules and regulations of the Secretary of the Interior.
43 U.S.C. § 315c (emphasis added). Under this provision, a permittee who “constructs and own[s]” an improvement on the public lands is entitled to compensation for its value from a subsequent permittee before the sub- . sequent permittee may use the improvement. Id.; cf. 43 U.S.C. § 1752(g) (stating that a permittee is entitled to reasonable compensation from the government for his interest in authorized permanent improvements he has constructed if the government cancels his grazing permit). Thus, new 43 C.F.R. 4120.3-2(b), which gives the federal government title to improvements built by a permit-tee, has significant consequences for permit-tees: since title to improvements is not in the hands of the permittees who construct them, permittees are not statutorily entitled to any compensation from later users.
The district court determined that section four of the Taylor Act. “strongly suggests that the individual who constructed the improvement should own it” and, therefore, struck down the Secretary’s range improvements rule as “exceed[ing] statutory authority.” Public Lands Council v. Babbitt, 929 F.Supp. 1436, 1442-43 (D.Wyo.1996). The majority disagrees with the district court, concluding that this statutory section gives the government unlimited discretion to determine what improvements, if any, may be both “constructed and owned” by a permit-, tee.
I cannot agree with the assertion that Congress wanted the Secretary to decide whether a permittee should hold title to improvements paid for and constructed by the permittee. In my judgment, the statute is not ambiguous on this point. It is a well-accepted principle that the first step in interpreting a statute is to determine whether the relevant language has a plain meaning with respect to the particular dispute in the case. See Robinson v. Shell Oil Co., 519 U.S. 337, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997). The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. See id. The phrase “such improvements constructed and owned by a prior occupant” plainly indicates to me that when a permittee constructs an authorized improvement, he or she holds title to that improvement. In my judgment, the previous version of section 4120.3-2, which shared title between the United States and permittee “in proportion to the actual amount of the respective contribution to the initial construction,” was an accurate and appropriate articulation of an unambiguous statutory mandate. 43 C.F.R. § 4120.3-2 (1994). Permittees acquired title for that portion of any improvement that they were responsible for constructing.
The provision for compensation in section four of the statute supports my reading. The majority’s reading of the statute, together with the Secretary’s new regulation, renders that compensation provision meaningless; without title, a permittee is • not be entitled to the compensation for which the statute provides. It is true, as the majority points out, that other regulations still guarantee permittees full compensation for their investments in improvements, even when they do not own those improvements. See 43 C.F.R. §§ 4120.3-5, 4120.3-6(e) (1995). The existence-of such regulations does not change the analysis, however. It cannot be doubted that section four of the TGA only guarantees compensation if the permittee owns the improvement. Under the Secretary’s approach — where the permittee does not own improvements — compensation to the permit-tee is a discretionary decision by the Secretary; so long as he wishes, by regulation, to compensate permittees, he may do so. Under this approach, however, there would also be no violation of law if the Secretary were later to end the regulatory entitlement to compensation. The majority’s equating a statutory entitlement to a discretionary entitlement embodied in a regulation reveals a misunderstanding of administrative law.
My conclusion that the statutory language is unambiguous on who holds title to improvements constructed on the public lands also reveals a great divide between the majority and me on the role that courts have in interpreting statutory language. We ought not examine statutory language so as to needlessly create ambiguities where no such ambiguity exists. Rather, in interpreting a *1191 statute, we should begin with a strong presumption that Congress expressed its will on the issue at hand. I disagree with the majority that one must add the word “therefore” to the phrase “constructed and owned” to reach the conclusion that I do. Clearly, one may deconstruct the statutory language as the majority does and insert an ambiguity into it. My common understanding of the statutory language, however, leads me to conclude that Congress thought about the question before us, and unambiguously spoke to it.
Nor do I agree with the majority that “nothing in the statutory language directs where such title must lie.” Maj. Op. at 40. That Congress specifically discusses ownership of improvements demonstrates to me that it thoroughly considered that question. The TGA is a statute replete with discretionary language and congressional grants of rulemaking authority. Such discretionary language or rulemaking authority is conspicuously absent on the question of who should hold title to range improvements. That is for good reason. Congress considered the question and spoke precisely to the issue. As I understand the role of the courts, I do not think Chevron gives us license to ignore the plain meaning Congress employed.